IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER M. FISHER,[1]

                Plaintiff,

  v.

TIMOTHY A. DOUMA, Warden; LARRY W. FUCHS, Security Director; DIANE M. FLADHAMMER, Housing Unit Manager; BRETT L. SUTTON, Food Service Administrator; HAZEL RITCHART, Food Service CFSL; S. GOODMAN, Institution Complaint Examiner; and VANBEAK, correctional officer.

                Defendants.

OPINION AND ORDER

17-cv-743-slc

---

    *Pro se* plaintiff Christopher Fisher filed this civil lawsuit pursuant to 42 U.S.C. § 1983, claiming that the defendants, all employees of New Lisbon Correctional Institution (NLCI) violated his First Amendment rights by retaliating against him for complaining about sexual harassment. Most recently, the parties consented to magistrate judge jurisdiction and this case was referred to me on September 5, 2018. (Dkt. 14.) For the reasons that follow, I am dismissing all of Fisher's claims.

ALLEGATIONS OF FACT[2]

I. **Parties**

    At all times relevant to his complaint, plaintiff Christopher Fisher was incarcerated at NLCI.

---

[1] Throughout his complaint, which was prepared by jailhouse lawyer Oscar McMillian, plaintiff spells his last name "Fisher." (*See* dkt. 1.) All of the official documents submitted with the complaint, refer to plaintiff as "Fischer." (*See* dkt. 1-1, *passim*.) McMillian probably got it wrong, but plaintiff signed and verified the complaint as correct, so I will refer to him as "Fisher" in this order.

[2] In addressing any *pro se* litigant's complaint, I must read the allegations generously. *Haines v. Kerner*, 404 U.S. 519, 521 (1972). Therefore, for purposes of screening, I assume the truth of the allegations in Fisher's complaint, unless otherwise noted.

The eight defendants all are NLCI employees: Warden Timothy Douma; Security Director Larry Fuchs; Housing Unit Manager Diane Fladhammer; SPN Investigator Captain Ralph; Food Service Administrator Brett Sutton; Food Services Staff Member Hazel Ritchart; Institution Complaint Examiner (ICE) S. Goodman; and Correctional Officer Vanbeak.

## II. Sexual Harassment in the Food Service Department

In December of 2015, Fisher and another inmate with the last name Tallie worked together in NLCI's food service department. Rumors were swirling that Fisher and Tallie engaged in sexual acts together while working, which led other inmate workers to harass them through name calling. On December 29, 2015, Fisher met with defendant Ritchart, at which point Fisher claims that he lodged a Prison Rape Elimination Act (PREA) complaint. Fisher specifically reported to Ritchart that other inmates – Parham, King and Justin – had been calling him names, including "fag," "punk," and "dick sucker," and that another inmate had threatened him with sexual assault. Fisher also told Ritchart that these inmates were responsible for spreading the rumor that Fisher and Tallie had been engaging in sexual acts together in the food locker. Ritchart responded that *she* had heard rumors about Fisher and Tallie. Ritchart assured Fisher that she would discuss his complaint with Sutton, the food service supervisor.

That same day, Ritchart wrote up an Incident Report about that conversation. (Pl. Ex. A/5-A/7 (dkt. 1-1) at 5-7.) In that report, she wrote that another inmate reported seeing Tallie and Fisher engaging in sexual contact in the food storage area on December 20, 2015, and that she spoke with Fisher, who denied the encounter. Ritchart wrote that she was forwarding her

2

report to PREA investigators to follow up. Ritchart's report omitted Fisher's complaint that he was being harassed by other inmates.

On January 3, 2016, Fisher and Tallie were placed on Temporary Lock-Up (TLU) status in the segregation unit, pending a PREA investigation of Fisher and Tallie, and of Fisher's complaints about harassment. On January 8, 2016, Captain Fladhammer interviewed Fisher. Fladhammer told Fisher that she was believed the claims that he and Tallie were engaging in sexual acts, and she did not believe Fisher's assertions that he had been harassed. While Fisher attempted to explain that he really had been harassed, Fladhammer stated that no one from the food service department had ever reported the harassment that Fisher claimed was occurring. Fisher told Fladhammer that she should interview inmate Dennis Jones, who had witnessed months of harassment.

On January 15, 2016, Fladhammer interviewed Fisher a second time, at which point she told him that she was going to release him from TLU status back into general population. Fisher asked her where he would be placed, apparently because he was worried about being placed near Parham, King, and Justin after he had implicated them in his PREA grievance. Fladhammer told Fisher that general population was appropriate because she did not find credible any of the allegations of harassment – not Fisher's allegations, and not those of the inmates who corroborated Fisher's story. Fladhammer added that she believed the type of treatment Fisher received was normal for gay inmates to receive. Ultimately, Fladhammer closed the PREA investigation because the claims were unsubstantiated, both with respect to Fisher's allegations about harassment and the other inmates' report that Fisher and Tallie had engaged in sexual acts

3

in the food service department. Fisher was released from TLU on January 19, and he returned to work on January 20, 2016.

When Fisher returned to work in the food service department, he still had to deal with crude comments and harassment. For example, inmate Jones told Fisher that defendant CO Vanbeak had commented that the PREA investigation lacked evidence because "Fisher had swallowed it all." Ritchart told Fisher that she wrote up an incident report about a correctional officer making comments about Fisher's homosexual lifestyle; it appears that she was referring to Vanbeak's comment. Fisher was growing more concerned about his safety, so he told the bakery teacher, Anita Jappe, that the environment the correctional officers created seemed hostile to members of the LGBTQ population. Jappe admitted overhearing comments made by staff members while Fisher had been in TLU, and shared her belief that other staff had heard similar comments. Jappe further agreed that Vanbeak was primarily responsible for the offensive comments. However, nothing was done in the food service department to address Fisher's concerns.

On January 25, 2016, Fisher met with an NLCI psychologist, Denise Romanow. Fisher reported feeling immense stress as a result of the false rumors that were spreading in the food service department as well as his housing unit. Fisher further told Romanow that he would like to be transferred to another housing unit to avoid bullying.

On February 16, 2016, Fisher received a conduct report charging him with lying and unauthorized transfer of property based on his receipt of property that someone else had stolen from the kitchen. Fisher did not contest the charges and he was found guilty of both charges the next day. On February 19, 2016, Ritchart fired Fisher from his job in the kitchen, based on the

4

conduct report and on Fisher's unsatisfactory job performance review. Fisher filed a grievance about this decision. ICE Goodman investigated and interviewed Ritchart about the decision. (*See* dkt. 1-1 at 35-26.)

Goodman recommended dismissal of Fisher's grievance:

> This ICE notes, on the DOC-780A, Ms. Ritchart states "Mr. Fisher was given a conduct report for receiving stolen property. The property came from the kitchen. Even though Mr. Fisher didn't take the property from the kitchen it is still a work related conduct report." *This ICE notes I/M Fischer did not contest the ticket* and he was found guilty of . . . Lying and . . . Unauthorized transfer or property.
>
> According to DAI Policy #309 00.01
> IV Work Removal or Refusals
> B. Removal by Work Supervisor
> 1. An inmate may be removed from his current assignment after any one of the following takes place and with Department Head approval.
> a. An unsatisfactory performance evaluation.
> b. A finding of guilt on a work related conduct report.

(*Id*. at 35 (emphasis added).) Goodman's decision was upheld on appeal, with the corrections complaint examiner finding that "The institution acted appropriately and within the code." (*Id.* at 39.)

On March 8, 2016, Fisher met with Dr. Romanow to report that he had been moved to a different housing unit as requested, but that his new unit housed two of the individuals responsible for starting the rumors about him. Fisher further reported that he had been terminated from his food service department position, and that he was living in fear for his personal safety. Fisher claims that Dr. Romanow did not take him seriously and reported that she believed Fisher was attempting to manipulate her.

5

### III. Fisher's Conduct Report

Fisher was frustrated that no one was responding to his complaints of harassment to his satisfaction; so he decided to take matters into his own hands. On March 29, 2016, Fisher submitted an anonymous Interview Request to NLCI staff in which he falsely reported that the two individuals about whom Fisher had complained to Dr. Romanow: (1) were planning to have Fisher beaten or raped; (2) may have been planning to take NLCI staff hostage; and (3) possessed weapons that they planned to use against staff. Not surprisingly, NLCI staff acted quickly to discover who had sent this request and found that it had been Fisher. Fisher admitted making the false allegations, claiming that he had no other option since NLCI staff was ignoring his complaints about sexual harassment.

On April 1, 2016, NLCI staff charged Fisher in a conduct report with violations of Wis. Admin. Code § DOC 303.31, Lying, and § DOC 303.33, Disruptive Conduct. Fisher acknowledged his guilt and accepted his sentence of 120 days in disciplinary separation in a summary disposition of the conduct report.

### IV. Fisher's Requests for Special Placement and/or Transfer

Starting in April, Fisher began submitting Psychological Services Requests (PSRs), in which he asked for attention for his "fast growing" psychological problems. Fisher met with a psychologist, Dr. Murphy on April 11 and reported his sexual harassment complaints and his desire to be transferred to another facility. Apparently Dr. Murphy made some suggestions to Fisher about how to deal with these issues. On April 11, 2016, Fisher submitted a four-page time line of the sexual harassment he had endured at NLCI. This time line went to Ms. Baldwin,

6

who was involved in reclassifying inmates at NLCI. Also, on April 14, 2016, Fisher submitted a Special Placement Need (SPN) request with a social worker named Ashley, and a similar request with NLCI's Security Director.

Fisher received a response from Baldwin on April 14, 2016. She instructed him to submit a form for early consideration of reclassification, in which he could detail his allegations of sexual harassment and retaliation. On April 27, 2016, Fisher learned that his SPN request was under review. On May 3, Fladhammer interviewed Fisher about his allegations, in particular focusing on CO Vanbeak's comment about Fisher. Fladhammer informed Fisher that Vanbeak's comment had become the subject of a PREA investigation. Before the interview ended, Fisher told Fladhammer that he had been fired from his food service department job in retaliation for his previous PREA complaint. In particular, Fisher told her that the poor work evaluation that staff used to justify his termination occurred shortly after his complaint and stood in contrast to his prior "above average" performance review.

On May 4, 2016, Captain Ralph interviewed Fisher about Vanbeak and told him he would not be getting an SPN, and that if he had it his way, Fisher would be buried in a hole. Ralph went further, telling Fisher that he knew that Fisher had complained about sexual harassment at other institutions and that his complaints simply wouldn't be tolerated at NLCI. Fisher's SPN request was officially denied the next day. On May 11, 2016, Fisher learned that his early reclassification was also denied.

On May 17, 2016, Fisher submitted a status request to Fladhammer, inquiring into the status of her PREA investigation of CO Vanbeak. Fladhammer responded that it had not been resolved. That same day, Fisher sent a grievance to Wisconsin Department of Corrections

7

Deputy Secretary Cathy Jess, complaining about the harassment he'd been enduring at NLCI. On June 3, 2016, Fisher received a response to his letter to Jess from Warden Douma. In that letter, Warden Douma recounted that NLCI staff had investigated his allegations of harassment and determined them to be unsubstantiated. Douma also wrote that as a result of Fisher's complaints about Vanbeak, a second investigation was ongoing. Finally, Douma concluded that Fisher's SPN request was appropriately denied because staff investigated and was unable to find any evidence confirming that Fisher was being harassed or threatened.

V.     Fisher's Transfer to a Maximum Security Institution

At some point in May of 2016, Security Director Fuchs referred Fisher for a reclassification. Fuchs believed that Fisher should be transferred as a result of the conduct report arising from his false report of an imminent attack against staff. On May 26, 2016, Fisher's social worker, Ashley, interviewed him as a part of the reclassification process. Fisher agreed that a transfer was appropriate, and he requested placement in another medium security institution that would allow him to work in food service. (*See* dkt. 1-1 at 25.) Ashley recommended that Fisher retain his medium security custody classification and that he be transferred to a medium security institution that could accommodate his SPN and programming needs.

On June 1, Fisher attended a reclassification hearing before NLCI's Reclassification Committee consisting of NLCI employees Baldwin, Washtas, and Renteria. The results of this hearing are memorialized in an Inmate Classification Report. (Dkt. 1-1 at 26-27.) The committee unanimously agreed that Fisher should not remain at NLCI, but it could not reach a unanimous conclusion as to whether to keep Fisher at the medium security level. Some

8

committee members–the report does not specify who–believed that Fisher should be reclassified to maximum security level based on his overall conduct, poor adjustment, short time in the community, and the nature and severity of the conduct report. Other committee members believed Fisher should remain at medium custody level because they found credible Fisher's allegations of harassment and they wanted further investigation of the two inmates whom Fisher claimed harassed him. On June 15, 2016, G. Konitzer served as a tie-breaker and concluded that maximum security placement was appropriate:

> Inmate Fischer has a history of lying in an attempt to disparage others as a ploy to advance his interests. The inmate's contrived report that other inmates were going to take a staff hostage clearly disrupted institution operations and required response measures to ensure staff safety. Although inmate Fischer acknowledges that he wrote the letter containing an untruthful report, there is no indication that he appreciates the wrongfulness of his actions.
>
> The committee does not find that the discipline imposed will have a corrective influence to the degree needed to retain in medium custody. He has a pattern of victimizing individuals that he has had some form of relationship with that becomes conflicted. He cannot be trusted to not report to similar actions in the future.
>
> Maximum custody placement at Any Maximum Security Site is recommended to manage the risk of further misconduct that he presents. A one year recall period is also continued.

(Dkt. 1-1 at 27.) Fisher learned about that decision that same day.

OPINION

Fisher specifically seeks to proceed on First Amendment retaliation claims related to his February 2016 termination from the food service department and to his June 2016 reclassification and transfer to a maximum security institution.

I. **Eighth Amendment; Vanbeak's Alleged Disparaging Remark**

Although Fisher does not cite to the Eighth Amendment in his complaint, I am *sua sponte* considering whether his allegations would support such a constitutional claim. I conclude that they do not.

Construing his allegations liberally, it may be that Fisher believes that defendants violated his Eighth Amendment rights by failing to protect him from harm. To succeed on such a claim, a plaintiff must prove that (1) he faced a "substantial risk of serious harm" and (2) the identified prison officials acted with "deliberate indifference" toward that risk. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Here, however, Fisher has not alleged that he actually was harmed as a result of defendants' handling of his reports of sexual harassment. Furthermore, Fisher has not alleged sufficient facts to support an inference that any of the defendants recklessly disregarded his complaints about sexual harassment. Rather, Fisher reports that Ritchart, Sutton, and Fladhammer all were involved in initiating PREA investigations related to Fisher's complaints of sexual harassment and that they separated Fisher from the food service department while investigating. Further, in June 2016, Douma responded to Fisher's complaint about how NLCI staff were handling his sexual harassment complaints by recounting the many steps that staff had taken to investigate Fisher's claims, reminding Fisher that the investigation into Vanbeak's

10

comment was ongoing.  Given that Fisher has not alleged that any of the defendants were aware of any ongoing risk of harm – and more importantly, that Fisher was never actually assaulted – none of these allegations support an inference of deliberate indifference.

Similarly, while Fisher names Vanbeak as a defendant, Fisher's only allegation against him is the inappropriate comment he made about Fisher.  Prisoners have no constitutional right to be free of inappropriate comments from prison staff or other prisoners.  *DeWalt v. Carter,* 224 F.3d 607, 618 (7th Cir. 2000).   Therefore, Fisher may not proceed against Vanbeak.

## II.     First Amendment Retaliation

Fisher claims that various defendants retaliated against him because of his complaints that he was being sexually harassed.  To state a claim for retaliation under the First Amendment against a defendant, Fisher must identify: (1) the constitutionally protected activity; (2) one or more retaliatory actions taken by the defendant that would deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) sufficient facts to make it plausible to infer that the plaintiff's protected activity was one of the reasons defendant took the action against him.  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  If the plaintiff is able to prove that an improper purpose was a motivating factor, then the burden shifts to the defendant to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct. *Spiegla v. Hull*, 371 F.3d 928, 942-43 (7th Cir. 2004).

As to both Fisher's termination from his job and his transfer to a maximum security prison, for the purposes of screening, I accept as truthful Fisher's complaints of sexual

11

harassment in his PREA complaint and in his grievances. Also for screening purposes, I accept that Fisher's termination from his job and his transfer to a maximum security institution would deter a prisoner of reasonable firmness from complaining about harassment in the future. Thus, the question to be answered for both of these adverse actions is whether Fisher's allegations are sufficient for him to proceed against the named defendants.

### A. Job Termination

The only defendant involved in Fisher's termination was Ritchart. The attachments to Fisher's complaint show that in February of 2016, Ritchart concluded that termination was appropriate for two reasons, one of which was because Fisher was found guilty of the job-related charge of possessing stolen kitchen property and of lying, charges that Fisher did not contest. (The second reason was Fisher's unsatisfactory performance evaluation.)

Typically in this circumstance, I would allow this claim to proceed past screening for fact-finding related to Ritchart's motivations. Fisher's case, however, is atypical because Fisher has pled himself out of court. If I granted Fisher leave to proceed on this claim, then all Ritchart would need to do to defeat this claim would be to point to Fisher's allegations and the documents that Fisher attached to his complaint. Under written prison policy, Fisher's conviction of a conduct report for possessing property stolen from his job site constituted an explicit ground for his termination. Fisher has not alleged that he was innocent of the charge in the conduct report; in fact, he did not even contest the charge at the time.

Giving Fisher the benefit of all inferences to which he is entitled and looking solely at Fisher's allegations and the attachments to his complaint, I conclude that it would be

unreasonable to infer that Ritchart was unjustified in terminating Fisher, even taking into account her knowledge of and reported skepticism toward Fisher's sexual harassment complaints. Put another way, Fisher's complaint and its attachments establish that Ritchart had a legally sufficient basis to fire Fisher in the absence of his protected conduct. *See, e.g., Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008)("A plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits") (citation and quotation marks omitted); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) ("[A] plaintiff may unwittingly plead himself out of court by alleging facts that preclude recovery."); *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006) ("if a plaintiff pleads facts which show he has no claim, then he has pled himself out of court").

Perhaps it goes without saying that this conclusion is a universal solvent on this claim: Fisher may not proceed against *any* defendant. To play out the hand, although Goodman may have been involved in resolving Fisher's grievance about his termination, Fisher has not alleged, and his attachments to his complaint do not suggest, that Goodman knew that Fisher had been complaining about sexual harassment. Accordingly, it would be unreasonable to infer that Goodman's recommended dismissal of Fisher's grievance was intended to punish Fisher's constitutionally protected activity. Finally, since no other named defendants were involved in terminating his position in the food service department, Fisher may not proceed against any other defendant. *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional violations.").

## B. Transfer to Maximum Security Institution

The operative question here is whether Fisher has alleged facts as to each defendant that would give rise to a reasonable inference that any of them facilitated his transfer to a maximum security institution to punish him for lodging legitimate complaints about sexual harassment.

This is where this claim falls apart. Fisher's first problem is that, as noted above, liability under § 1983 requires personal involvement. None of the named defendants was involved in transferring Fisher to a maximum security institution. *See Minix*, 597 F.3d at 833-34. It was Reclassification Committee members Baldwin, Washetas, Renteria, and Konitzer, who made the determination to transfer Fisher to a maximum security facility. Fisher has not named any of these people as defendants in this lawsuit.

While there might have been more appropriate defendants, Fisher's got a problem: he does not dispute the content of the documents he has attached to his verified complaint, and those documents establish that the decision to transfer him to maximum security was based on Fisher's *admitted* lies implicating staff safety and institution security. Given that Fisher has affirmatively alleged that he submitted a highly alarming false Interview Request, the committee members easily could defeat this claim by pointing to the determination by the majority of the committee members that the security risk Fisher posed justified his transfer to maximum security, regardless of any motivation to punish him for complaining about harassment. *See Spiegla*, 371 F.3d at 942-43. Accordingly, since Fisher has no reasonable basis to proceed past screening on a retaliation claim against any conceivable defendant, I am dismissing this complaint.

ORDER

IT IS ORDERED that:

1. This case is DISMISSED with prejudice for plaintiff Christopher Fisher's failure to state a claim upon which relief can be granted. The clerk of court is directed to enter judgment and close this case.

2. Plaintiff is assessed a strike in accordance with 28 U.S.C. § 1915(g) (barring a prisoner with three or more "strikes" or dismissals for filing a civil action or appeal that is frivolous, malicious, or fails to state a claim from bringing any more actions or appeals in forma pauperis unless he is in imminent danger of serious physical injury).

Entered this 28th day of January, 2019.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge